IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
ROCK HILL DIVISION

| | |
|---|---|
| Catawba Indian Tribe of South Carolina,<br><br>　　　　Plaintiff,<br><br>　　　v.<br><br>City of Rock Hill, South Carolina,<br><br>　　　　Defendant. | Civil Action No. 0:04-22374-CMC<br><br>**ORDER AND OPINION<br>ON MOTIONS FOR<br>SUMMARY JUDGMENT** |

　　　This matter is before the Court on both parties' motions for summary judgment. Plaintiff Catawba Indian Tribe of South Carolina brought this action against Defendant City of Rock Hill, alleging that an ordinance passed by the City was an impairment of the obligation of certain contracts between the parties. Plaintiff moved for summary judgment on its claims, seeking a declaration that the ordinance was unconstitutional as applied to the contracts between the parties, and seeking to enjoin the City from enforcing the ordinance and from keeping fees Plaintiff paid under the Ordinance. In response, Defendant moved for summary judgment seeking dismissal of Plaintiff's claims.

## Background

　　　On March 17, 2003 the City passed an ordinance imposing water and wastewater impact fees (the "Ordinance") in order to recover system improvement costs related to new development. The City had concluded that its current system was sufficient to meet existing demand, but that growth would increase demand beyond the system's capacity. According to the Ordinance, it was intended to impose on new growth and development a proportionate share of the cost of new water

and wastewater facilities needed to serve such development. The fees were intended only to fund, and not to exceed, such improvement costs and were to be applied as follows:

> The water and wastewater development impact fees imposed by this Ordinance shall be assessed on behalf of the City by the Planning and Development Department for all water and/or wastewater service requests. As used herein, water and/or wastewater service requests include, but are not limited to, new service, water and/or wastewater extension requests and agreements, additional meters, or upgrades of existing services that will create any new or additional demands on the City's water and/or wastewater systems.

According to the affidavit of the Rock Hill Municipal Clerk and Finance Director, the Ordinance imposed water and wastewater impact fees "on all requests for service made after June 30, 2003." *Affidavit of David B. Vehaun*, ¶ 8.

Plaintiff and the City entered into four Extension Agreements in July and October of 2002 for the construction of water mains and sewer facilities to serve parts of Plaintiff's reservation, which is located outside the City's municipal limits. Under these Extension Agreements, Plaintiff contracted to pay the City for extension of water and wastewater lines to Plaintiff's property and for connection to the City's utility system. Plaintiff contracted to pay a total of $260,464.00 for the construction of sewer mains and accessories, $125,934.00 for the construction of water mains and accessories, and $3,630.00 (or $55.00 per meter) for sixty-six water meters, including installation. Each of the four contracts had a provision that stated: "The water meters will be installed by the City, on request by [Plaintiff], when water service is needed."

On June 19, 2002 and September 24, 2002 Plaintiff made payments for the installation of the sixty-six water meters, in accordance with the terms of the contracts. Defendant does not dispute that Plaintiff made these payments and fully performed under the contracts. Plaintiff did not request installation of the meters until August of 2003, at which point the City imposed an

2

impact fee of $100,478.00 in connection with the installation. Plaintiff paid the fee under protest. Plaintiff then filed this lawsuit, alleging that the Ordinance under which the City imposed the impact fee was an unconstitutional impairment of the Extension Agreements between the parties.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987). The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

## DISCUSSION

Plaintiff's only cause of action is a violation of the Contract Clause. The contracts that Plaintiff claims the City impaired are the Extension Agreements, dated June and September of 2002. Plaintiff argues that it fully performed and fulfilled all of its obligations under the contracts, but the City sought more money from Plaintiff before the City would perform its own obligations under the contracts. The event that triggered the imposition of impact fees was Plaintiff's request for installation of water meters in August of 2003: "the Catawba Indian Nation called on [the City] for installation of the water meters when water service was needed." *First Affidavit of Carson Blue*,

April 20, 2005 ¶ 13.  "At the time it demanded payment of the impact fees [the City] insisted that payment of the impact fees was required in order for the water meters to be installed." *Second Affidavit of Carson Blue*, July 19, 2005 ¶ 9.  The parties do not dispute that a request was made in August of 2003, that the substance of this request was installation of water meters, and that, as a result of such request, impact fees were imposed on the Plaintiff.  Plaintiff also concedes that the City has the power to impose such a fee, and that the Ordinance is not unconstitutional on its face.  What the parties disagree about, however, is whether or not the imposition of the impact fees was related to the Extension Agreements, and whether such imposition unconstitutionally impaired the Extension Agreements.

The Contracts Clause, U.S. Const. art. I, § 10, cl. 1 states, "No State shall ... pass any ... Law impairing the Obligation of Contracts."  Though phrased in absolute terms, the Supreme Court does not interpret the clause absolutely to prohibit the impairment of either government or private contracts.  *Baltimore Teachers Union v. Mayor and City Council of Baltimore,* 6 F.3d 1012, 1014 (4th Cir. 1993).  Rather, it has developed a three-part balancing test to harmonize the language of the clause with the sovereign power of states.  *Id.* at 1015.  Under this test, it must be determined first whether there has been an impairment of a contract; second, whether the law has, in fact, operated as a *substantial* impairment of a contractual relationship; and third, whether that impairment is nonetheless permissible as a legitimate exercise of the state's sovereign powers.  *Id.*

### I.     Impairment

Plaintiff argues that the Extension Agreements have been impaired by the Ordinance, because application of the Ordinance required Plaintiff to pay more than it contracted to pay before the City would perform its own obligations under the contract.  The City, however, takes the

position that the impact fees created by the Ordinance are outside the scope of the obligations of the Extension Agreements.

Each Extension Agreement is just over a page long. The subject matter covered in each includes: installation of water and sewer mains, accessories, and meters; the cost of such work; an agreement that the installation will become part of the City's utility system; and insurance and liability issues related to the work. The Extension Agreements do not address any other fees or costs, nor do they address or provide terms for water or sewer service. The language of the four contracts with regard to installation of the water meters is identical in each:

> [Plaintiff's] construction contract shall require all water and/or sewer services to be stubbed out to the property line at the time of main line installation. Additionally, [Plaintiff] shall pay to the City the total sum of [$ _____] to cover [_____] water meter installations, after stub out under the construction contract, with no additional for stubbed out sewer services. The water meters will be installed by the City, on request by [Plaintiff], when water service is needed.

The amount paid and number of meters differed in each contract, but the sum total was $3,630.00 for sixty-six water meters. According to the above language, the contracts contemplated that installation of meters and the need for water service would occur simultaneously.

The City argues that the Extension Agreements were not impaired by the imposition of an impact fee, because the sole purpose of the agreements was to establish the terms and conditions for the physical connection of the new development to the City's utility system. The agreements were not requests for service, they did not contain the necessary right of way conveyance for the dedicated infrastructure, nor did they address the rates and charges associated with service. The impact fees, the City contends, apply to new requests for service in order to offset the costs associated with increases to the City's system capacity. The Extension Agreements are silent as to

5

any fees or costs other than those associated with the physical connection of the property to the City's water system.

Plaintiff offers conflicting evidence about whether or not a request for water service was made at the time the meter installation was requested. In one affidavit, Plaintiff's secretary-treasurer claims that the "Catawba Indian Nation ... expended substantial sums to construct water and sewer lines and had at great expense constructed residences and service facilities on its Reservation *all of which needed water and sewer service.*" *First Blue Aff.*, ¶ 16. Furthermore, Plaintiff "called on defendant for installation of the water meters *when water service was needed.*" *Id.* at ¶ 13. The natural inference from these statements is that Plaintiff's request for meter installation coincided with a request for water service. But a second affidavit represents that Plaintiff "was receiving water and sewer service on the subject property" pursuant to a service agreement signed September 17, 1999 entitled "Water and/or Sewer Service Agreement and Restrictive Covenant," ("1999 Agreement"). *Second Blue Aff.,* ¶ 10. Plaintiff alleges that this 1999 Agreement was a request for water service, and that it is "the only service agreement between the parties for water and sewer service for the subject property." *Second Blue Aff.*, ¶ 7. Plaintiff does not explain, however, how it could have been receiving water service to its property before water and sewer lines were physically connected to such property.

Defendant, on the other hand, alleges that the 1999 Agreement did not entitle Plaintiff to water or wastewater services, pointing out that the subject of the 1999 Agreement was Plaintiff's commitment to agree to future annexation in return for service from the City, and the 1999 Agreement did not establish the City's fees or rates for service. In order to receive service, Plaintiff would have to apply and execute a standard service agreement. *First Affidavit of James G. Bagley,*

6

¶ 24. However, the record does not include a copy of any such agreement executed by Plaintiff.

This court is faced with cross summary judgment motions on this issue. If the record demonstrated that Plaintiff both made a request for water service and executed a service agreement when it requested installation of the water meters in August 2003, it would be difficult to find that any impairment of the Extension Agreements existed as a matter of law – the impact fee would clearly relate to the request for service, which was not governed by the Extension Agreements. However, because there is a dispute of fact about whether or not Plaintiff's August 2003 request was simply a request for Defendant to install meters as contemplated by the contracts between the parties, or if it was also a request for water service, such dispute prevents the court from finding for either party on the issue of impairment. For purposes of deciding these motions, however, the court will assume that an impairment of contracts existed and analyze the remaining factors.

## II.     Substantiality of Impairment

In determining whether or not an impairment is substantial, "of greatest concern appears to be the contracting parties' actual reliance on the abridged contractual term." *City of Charleston v. Public Service Commission of West Virginia,* 57 F.3d 385, 392 (4th Cir. 1995). Courts may look at whether the right abridged was one on which there had been reasonable and especial reliance,[1] or one that induced the parties to contract in the first place. *Baltimore Teachers,* 6 F.3d at 1017.

---

[1] On occasion, the Supreme Court has inquired whether the impairment has altered the parties "legitimate expectations," but the Fourth Circuit has noted that to the extent that actual reliance and expectations are not intended to be one and the same, the inquiry into expectations has little probative value in determining substantiality. *Baltimore Teachers,* 6 F.3d at 1017, n.7.

Whether or not there has been reliance may depend on explicit provisions of the contract, or on whether or not the particular rights at issue were necessarily subject to legislative impairment. *Id.*

Plaintiff claims that the City used the Ordinance to impose a fee nearly 28 times that required by the Extension Agreements for the installation of water meters and sewer connections. It appears that the "right abridged" was Plaintiff's right to have water meters installed and sewer connections made for $3,630.00. The record does not indicate whether or not the parties negotiated the price terms or to what extent Plaintiff was induced to enter the contracts by this particular term. However, it is doubtful that Plaintiff considered this price term inclusive of water service and relied on this expectation in agreeing to the terms of the contracts. The Extension Agreements make it clear that the $3,630.00 was the price paid to cover only "water meter installations," but the sentence immediately following this price term states that the meters would be installed at Plaintiff's request "*when water service is needed*." The Extension Agreements themselves tie the provision of the water meters with the need for water service. Certainly Plaintiff did not expect water service to be included in the price of the contracts. Thus, it would not have been reasonable for Plaintiff to rely on not having to pay more than $3630.00 if Plaintiff requested water service. However, the parties dispute whether or not Plaintiff actually requested water service in August of 2003. Therefore, the question becomes whether or not it would have been reasonable for Plaintiff to rely on not having to pay more than $3630.00 if Plaintiff requested only the installation of water meters. The Extension Agreements do not explicitly exclude this possibility and additional factors indicate that such reliance may not have been reasonable.

First, the City explains at length the extent to which the legislative process leading up to the passing of the impact fee Ordinance was an entirely public process, lasting several years. Indeed,

the public discussion of impact fees began in 2000, more than two years before the Extension Agreements were signed. Plaintiff does not dispute the public aspect of the Ordinance's history. Therefore, as early as 2000, Plaintiff should have at least had constructive notice that as a property developer seeking to impose new demand on the City's water and wastewater system, it would be required to pay an impact fee at some point.

In addition, the 1999 Agreement produced by Plaintiff in opposition to Defendant's motion provides further evidence forecasting the possibility of impact fees. An agreement by Plaintiff to execute any annexation petition presented to it in return for utility service to its property, which lay outside the municipal boundaries, the 1999 Agreement contains a paragraph that provides:

> [Plaintiff] agrees that any breach of conditions of any and all agreements associated with utility service made in accordance with this Agreement, shall be a breach of this Agreement. Such conditions may include, but are not limited to: payment of applicable tap-on fees as fixed by the City Ordinance; and payment to the City when due such water and/or sewer charges or user fees as may be imposed from time to time.

Whether or not it represents Plaintiff's only water service agreement, this 1999 Agreement anticipated that certain additional fees might be imposed on Plaintiff in association with the City's utility service, and such terms were not contradicted or rescinded by the Extension Agreements signed three years later. In fact, the 1999 Agreement explicitly provided that it would be applied to such extension contracts:

> Any actions or statements by the City in relation to providing utilities services to the subject property, including but not limited to, the issuance of a letter of willingness and capacity to serve, *the extension of a water or sewer main,* or the commencement of service, *is made subject to the terms of this Agreement*.

The 1999 Agreement also demonstrated an understanding between the parties that utility service was subject to regulation by legislative enactment. "When assessing whether there has been

requisite reliance, the Court has looked to objective evidence of reliance. For example, … whether the contract – either explicitly or implicitly – indicated that the abridged term was subject to impairment by the legislature." *City of Charleston,* 57 F.3d at 392-393. The 1999 Agreement expressly acknowledged that the conditions of "any and all agreements associated with utility service" might include fees "as fixed by the City Ordinance." The 1999 Agreement should have made Plaintiff aware that the terms of any agreement associated with water or wastewater services were subject to legislative authority or regulation.

In determining substantiality of impairment, another factor to be considered is "*how* a contract has been changed, i.e., whether a covenant was abolished or 'merely modified.'" *City of Charleston,* 57 F.3d at 393. A law that totally eliminates a prior promise is likely a substantial impairment. *Id.* In this case, a prior promise was not abolished – from Plaintiff's perspective, the terms were modified by imposition of the impact fee. However, the City applied the Ordinance only to requests for service made after June 30, 2003. The delay in the enactment provided an opportunity for Plaintiff to escape imposition of the fee, and to thereby avoid modification of the terms of the contracts.

Plaintiff was at least empowered with some control over such modification, because the imposition of the impact fees on Plaintiff was reasonably foreseeable. As Plaintiff points out, "[t]he imposition of the fee on plaintiff as a condition for installation of water meters is entirely consistent with the language of the ordinance." *Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment,* p. 4. The Ordinance's applicability to a request for meter installation was apparent from a plain reading of the Ordinance itself. In light of the Ordinance's language and

public nature, Plaintiff does not explain why its request for meter installation did not occur before the June 30, 2003 deadline, after which it would have been reasonable to expect to pay impact fees. After assessing all of the above factors, and based only upon the undisputed facts, the court does not find that the application of the Ordinance to impose an impact fee on Plaintiff was a substantial impairment of the Extension Agreements.

### III. Legitimate Exercise of Sovereign Power

"Only if there is a contract, which has been substantially impaired, and there is no legitimate public purpose justifying the impairment, is there a violation of the Contract Clause." *City of Charleston,* 57 F.3d at 391. Even if this court had found that the Extension Agreements were substantially impaired by application of the Ordinance, such impairment was "reasonable and necessary to serve an important public purpose." *Baltimore Teachers,* 6 F.3d at 1018. "Legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations ... even though the effect of the legislation is to impose a new duty or liability based on past acts." *Carbon Fuel Co. v. USX Corp.,* 100 F.3d 1124, 1137 (4th Cir. 1996). The Fourth Circuit gives significant deference to legislative policy decisions in cases involving a claim under the Contract Clause:

> It is not enough to reason, as did the district court, that '[t]he City could have shifted the burden from another governmental program,' or that 'it could have raised taxes.' Were these the proper criteria, no impairment of a governmental contract could ever survive constitutional scrutiny, for these courses are always open, no matter how unwise they may be. Our task is rather to ensure through the 'necessity and reasonableness' inquiry that states neither 'consider impairing the obligations of [their] own contracts on a par with other policy alternatives' or 'impose a drastic impairment when an evident and more moderate course would serve its purposes equally well,' nor act unreasonably 'in light of the surrounding circumstances.'

*Baltimore Teachers,* 6 F.3d at 1019-20 (*quoting United States Trust Co. of New York v. State of New Jersey,* 431 U.S. 1, 30-31 (1977)) (holding a temporary 1% reduction on the paychecks of teachers and police was reasonable and necessary in light of the budget crisis).

"The Contract Clause is not an absolute bar to subsequent modification of a [City's] own financial obligations." *United States Trust,* 431 U.S. at 25. But such modification must be "reasonable and necessary to serve an important public purpose." *Id.* This requirement of a legitimate public purpose guarantees the City is using its police power, rather than providing a benefit to special interests. *Baltimore Teachers,* 6 F.3d at 1019 (*citing Energy Reserves Group, Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 412 (1983)). When a state operates to interfere with private contracts, courts defer to legislative assessments of the reasonableness and necessity of a particular measure. *Baltimore Teachers,* 6 F.3d at 1019. But when, as here, a public contract is involved, a more scrupulous examination is appropriate. *Id.* "While complete deference [to legislative modification of public contracts] is inappropriate, however, at least some deference to legislative policy decisions to modify these contracts in the public interest must be accorded." *Id.* (citations omitted). The necessity and reasonableness inquiry ensures that municipalities do not "impose a drastic impairment when an evident and more moderate course would serve its purpose equally well." *Id.* at 20 (*citing United States Trust,* 431 U.S. at 30-31).

In this case, the City had a legitimate public purpose, which Plaintiff does not dispute, and it did take a more moderate course. Facing an estimated cost of over $25 million in water capital improvement costs and nearly $55 million in wastewater capital improvements attributable to new growth, the City tailored imposition of the fee to those who would be generating the need for improvements, rather than imposing it on all water and wastewater customers. Plaintiff was in the

class of persons to whom the Ordinance was intended to apply. The legislation was directed at new development, and the City had rationally concluded that the costs of capital improvements to support new development should be born by those who were creating the need for such improvements.

Furthermore, the City delayed application of the Ordinance in a way that allowed any party who was seeking new water service to do so by June 30, 2003 without having to pay an impact fee. In light of the fact that Plaintiff's new development was of the kind that was creating greater demand on the City's infrastructure and causing the need for capital improvements, it seems that the City struck a fair compromise in delaying application of the impact fee even for such developers. Plaintiff has not disputed the City's contention that, had Plaintiff made its request prior to July 1, 2003, Plaintiff would not have been assessed an impact fee. Nor has Plaintiff offered any reason for its delay. The institution of the fee was public enough that 236 requests or permit applications were made in June, compared to only 36 in July. *Affidavit of Kathy Paterniti,* ¶ 8.

South Carolina law has acknowledged that the right to contract for utility rates is subject to the police power: "the right to contract is not absolute; it is subject to the state's police powers which may be exercised for the protection of the public's health, safety, morals, or general welfare." *Anchor Point, Inc. v. Shoals Sewer Co.,* 418 S.E.2d 546, 550 (1992). "Not only are existing laws read into contracts in order to fix obligations between the parties, but the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order." *Bannum, Inc. v. Town of Ashland,* 922 F.2d 197, 202 (4th Cir. 1990). The regulation of utilities is one of the most important of the functions traditionally associated with the police power of the states, *Arkansas Electric Co-op. Corp. v. Arkansas Public Service Commission,* 461 U.S. 375 (1983), and

the City cites numerous cases in which Contract Clause challenges to water and wastewater fee increases have been unsuccessful. *See Robert T. Foley Co. v. Washington Suburban Sanitary Comm'n,* 389 A.2d 350, 357-58 (Ct.App.Md. 1978) (upholding a sewer charge increase from $300.00 to $750.00 per unit); *Anglo Fabrics Co. v. Town of Webster,* 2002 WL 31187829 *9 (Mass. Super. 2002) (allowing rescission of a contract in order to implement new user fees resulting in an increase of $1,278,765 in charges over a ten-year period); *Irvin Water Dist. No. 6 v. Jackson P'ship,* 34 P.3d 840, 845 (Wash.Ct.App.2001) (upholding a new connection charge increasing the connection fees from $19,000 to $140,000); *Lincoln Shiloh Assoc., Ltd. v. Mukilteo Water Dist.,* 724 P.2d 1083, 1087 (Wash.Ct.App. 1986) (upholding increase in connection fees from $6,400 to $95,680).

The City has demonstrated that the application of the Ordinance to impose an impact fee on Plaintiff was a legitimate exercise of its sovereign power, such that even if the Extension Agreements had been substantially impaired, such impairment would have been justified.

## **CONCLUSION**

For the reasons set forth above, the court finds that there was no substantial impairment of Plaintiff's contracts, and even if there had been, such impairment was justified by a legitimate public purpose. Because the court finds that there has been no violation of the Contract Clause, and thereby no claim under 42 U.S.C. § 1983, it is not necessary to reach the question of whether or not § 1983 encompasses claims under Article I for impairment of contracts. Further, it is not necessary to address whether or not Plaintiff would be entitled to attorneys fees under 42 U.S.C. § 1988. For the reasons set forth above, Plaintiff's motion for summary judgment is DENIED. Defendant's motion for summary judgment is GRANTED and this case is hereby dismissed.

**IT IS SO ORDERED.**

                                                s/ Cameron McGowan Currie
                                                CAMERON MCGOWAN CURRIE
                                                UNITED STATES DISTRICT JUDGE

August 22, 2005
Columbia, South Carolina

C:\temp\notesB0AA3C\04-22374-tp-Catawba v. Rock Hill-cross SJ motions.wpd